Good morning, Your Honors, Counsel. I'm Susan Horner. I represent the Plaintiff and Appellant Judith Hemenway. She's an employee of the Booz Allen Hamilton Corporation and is currently partially disabled from her occupation. This case involves, as you know, the interpretation of a contract and the determination of the nature of this employee's receipt or any employee's receipt of a bonus payment after they become disabled but which was earned and in effect for the pre-disability period. Particularly at issue are the words of the BME definition that involve the regardless of when received or the pre-tax compensation which does include bonuses and the bonus averaging for the period of employment which is to be adjusted. The question is what is the word adjust? Does it require that the BME already be calculated and that the BME then be brought into accord with a later receipt bonus payment that is earned before disability or does it act as a cutoff for all bonus payments or does it act as a cutoff for all bonus earnings? And that is what the District Court grappled with and that is what we are dealing with. To answer those questions, I thought that probably the first thing we should do is real quickly look at the facts that we have. Starting in 1997, Ms. Hemenway was hired on October 6 and the end of the fiscal year was March 31. She received a pre-hire letter that discussed her compensation package and it was presented at the record page 161. It states, in addition to your base salary, you will be eligible to participate in an incentive bonus plan based on your performance for that year. This bonus could result in an additional annual compensation, i.e. payment, of up to 20% of your earned salary within the fiscal year. Your progress toward accomplishing six months worth since you began in October 6 of your first year business and professional objectives by March 31, which is the end of our fiscal year, will provide the basis for your fiscal year end 98 bonus award. So the award becomes the payment, but it's calculated based on the employee's production and work and it is only in effect during the bonus period, which is the fiscal year while the employee works. Once the employee ceases working, whether it be from a disability or takes a sabbatical or whatever, they're no longer earning any bonus. And therefore, if you look at the BME definition and the BME says specifically relates or refers to the company's fiscal year, and there had to have been a reason for including that, that's March 31 through April 1 of each year. So there's recognition in the policy that Booz Allen required to be there about its fiscal year. Each year, Booz Allen pays all of its employees the bonus calculated on their earnings and the production during the work period. It says the basic monthly earnings before an employee becomes disabled. If the employee has not become disabled, Unum does not even know they exist out there other than they're a number of one of many, many employees. There's no calculation of a BME. There's no claim submitted. There's nothing. So on August 1 adjustment date of the BME doesn't even make sense to apply that before disability. What makes sense is where it says bonuses or the basic monthly earnings will be their bonuses on August 1 each year is when the claim is submitted and the BME is calculated, then if an employee receives their bonus for the effective period that was pre-disability but receives it after disability and the BME has already been calculated, then the contract would require at the next August 1 for that BME to be adjusted. And it would be adjusted by taking all the bonuses for the period of employment of that employee, in this case because it was less than three years, was 12 and a half months, and add those bonuses together, divide them by the period of employment, which is 12.5, add it to the base salary, which for her was $76.50, and you arrive at the adjusted BME. Ms. Hemingway has always thought, continues to think that her, that the contract is unambiguous. Had Unum intended for the August 1 date before disability, before they ever knew disability occurred, before they ever calculated a BME to be a bonus payment cutoff, they could have put it in the have both Unum and the district court applying the pre-disability August 1 date, BME adjustment date, as a cutoff of some sort. Unum made the pre-disability August 1 bonus adjustment, or BME adjustment date, a bonus payment cutoff, a receipt cutoff. And they did that because they construed the second bonus received as only in effect when it's received. And that would make superfluous or just meaningless the regardless of when received language. The court, however, made the pre-disability August 1 BME adjustment date a bonus earnings cutoff. So the court said, you're right, you are up to the date they become disabled, they're not entitled to it. And Ms. Hemingway believes that both of those cross the line into amending the policy. What's the point of having an adjustment date then, under your theory? I mean, I understand your argument about receipt, but it looked to me as though the finding of fact that the bonus, there's no sense in including the bonus as part of the compensation package if you didn't intend to protect those earnings through this disability income protection policy. But it almost appears as though the district court was confused by the August 1 date, because it doesn't state August 1, and there are a lot of dates. And if you go through the March 31 as the end of the first fiscal year and start the next fiscal year, there's no question that the first bonus was paid before she became disabled, and it was at the normal June, mid-June payment period. And it was before the August 1, quote, of each year. And then you come up to the date of disability, and he said, well, I agree that they should be able to earn their bonus, but I'm going to cut it off at this pre-disability August 1 date. So if the BME is already calculated, in this case it was in about June of 1999 is when it was calculated, the was paid the second bonus in mid-June 1999. So how to apply that adjustment date, here you have a BME that's been calculated. At the time they did not take into account the first bonus. But assuming that they did, let's just sort of correct the facts as happened, and they applied the first bonus at that employment period, which was 12.5 months, and added that to the BME, which, or the, sorry, the basic salary, which was 76.50. And that would have produced a number. That would have produced the BME. They would have started paying her benefits on August 1. If there was any later received bonus that was in effect for the pre-disability period, but paid later, then it would have required the accounting division to go, okay, we need some adjustments to make, just like they did during this action. They go back, they take the base salary, they add the prior, the first bonus, and the second bonus together, divide it by the period of employment as the contract specifies, add that average number to the base salary, and they come up with the adjusted BME. And would the adjustment then apply only prospectively? Pardon me? And the adjustment would apply then only prospectively? It doesn't make sense for the, the word adjust means bring it into a court, so it doesn't make sense to apply the word adjust to when you're first calculating the BME. You just include whatever goes. Under your scenario, somebody, let's say, is disabled, and a BME is calculated, then a bonus comes in, and no account is taken of that bonus for a while until you get up to August 1. Correct. Then in August 1, you recalculate, but you don't, you don't pay arrearages or anything, do you? You just, you just pay from that. It doesn't state, and that issue did not come up. And it probably would be, it probably would need to be, because insurance companies typically make a claim, well, we've overpaid you, we get to collect back, or we will offset future benefits against what we overpaid you, or we've underpaid you, here's the balance. Well, my, the reason my question, if the question is what efficacy does the August 1 date have, it would have more efficacy if it meant that it's only as of August 1 that the company becomes liable to pay the higher rate that takes the bonus into account. Then it doesn't make sense to have the regardless of when received. And why didn't they, if they did that, then why didn't they say on the, on the first, or on the, excuse me, last August 1 before you become disabled? And, in fact, if this lady had become disabled, let's say she's in a car accident at the end of February, and she goes out on sick leave, but she can't return to work as of, say, mid-March, then you've got all of the earnings, the bonus earnings from August 1, or if you call it a cutoff date, you don't have any of it, but if you call it what the court did as a cutoff, then you have all of that money up to, or the earnings up until mid-March. And the, the, basically the pro rata or equivalent amount that this lady earned for the six months that she was employed until she became disabled was 20 percent of her earnings. So she received the full 20 percent. If she had become disabled right before the end of the year, the end of the fiscal year, and then wasn't paid until the normal mid-June when all she would have lost 20 percent of her income protected, and so the 60 percent of coverage would have been reduced to 40 or 50 percent of coverage. She loses this. That's a significant part of the compensation package, and she loses that. And, in addition, what's dangerous and what's important about this issue, if you multiply this times five employees times ten employees, there are significant savings to the insurance company, to the benefit of the shareholders, and to the loss of the employees when this contract could have been stated much more clear if that was the intent. And the appellant did invite evidence, expressly invited evidence to be submitted by UNUM about a uniform construction of this contract in this manner, whether it be by a guidelines manual or the underwriting manual that might have shown how it was intended to be used. None of that came in, which suggests that they couldn't support it. This was an interpretation applied for this employee. And the other danger and the other importance of this is if, in fact, the employees are paid 20 percent or earn 20 percent because it's based on their production, at the end of the year they're given this check for 20 percent of their salary, and most of the partial disability definitions will cut off or will say you're not disabled if you can earn 80 percent or more. Well, if she had 20 percent income coming in, then the drop, well, actually I'm not sure that that would work. But the concern was whether the 20 percent income from the earnings that she earned before disability, almost like a commission person or a self-employed person who doesn't earn an hour-to-hour wage or a set wage, their earnings come in by receivables. I mean, they've earned a certain amount, but the income comes in one month or two months later as receivables come in. She must have worked about six months in each of the two fiscal years. Is that correct? She did. She worked from October 6th in the fiscal year, which is March 31. And so that was 6.3 or 5. Would her bonus have been twice as high if she'd worked 12 months in each of those fiscal years? Yes. The bonus that she was paid based on her production was 20 percent of what she made. It was 20 percent of the six-month salary? Yes. Had she worked the full year and not had her Addisonian crisis at all or maybe until two years down the road, then she would have received that. Now, when she was out on disability, she earned no bonus. And now that she's back on partial disability, she earns a bonus, but again, it's calculated based on her production. She came back on partial disability, though, after all the events that we're really concerned with. Isn't that correct? Correct. But once you calculate the BME and if there's a later adjustment, then that BME acts as the major for the base for all disability. I understand that. Do you want to save some time for rebuttal? You've got about five minutes left. Let me see if I have any other comments. I guess one comment on the appellee's brief. I must say that appellant is confused because Unum repeatedly refers to a given length of time of one year, annual, same 12 months, when they're really referring to three different periods, that being October 6, which is data higher, to October 21, date of disability, that being March 31 to April 1 each fiscal year, and that being the mid-June to mid-June bonus receipt. And I think that that creates great confusion and it actually changes the facts. The other thing is that Unum admitted on one hand that the district court is right, i.e., in terms of making the pre-disability August 1 date a bonus earnings cutoff, but then it advances the same argument that it did in its cross-motion for summary judgment and it says, well, it's based on this anti-stacking fiction. You can't tack two bonuses together, so you should exclude all of the second bonus. So at this point, appellant is not certain where Unum is really interpreting the contract. But it does appear that there's more than one reasonable explanation or interpretation of the contract, which does bring into play the strict construction rule contra preferendum and whether it violated the SPD drafting regulations. Thank you, counsel. Good morning, Your Honors. My name is Ed Oster and I represent the defendant and the appellee in this matter. I'd like to suggest that the most effectuate the intent of a disability payment program in the first instance and what any plan is trying to accomplish when it has a determination of what the monthly benefit is and why that is a factor at all. I think that there's probably no rule, no scheme, no statute, no plan about which we all of questions and say, well, because I can possibly interpret it this way, it could possibly mean this or it could possibly mean that. I think we start with what the intent was and try to effectuate that intent. How do we know that without the underwriting documents? Pardon me? How do we know that without the underwriting documents? Because I think that it's a matter of common sense, Your Honor, that the idea of income replacement is to replace income that is earned, not to provide a windfall. There is no disability program that I'm aware of that will provide somebody greater income than they actually lost as a result of being disabled. Why wouldn't it? Why isn't her monthly income, her pay for the months she worked, and then the allocation of a bonus? Let's say she had only worked six months. And she works six months and gets an $8,000 bonus. I would say, well, her pay must be her monthly pay that she got each month plus a sixth of the bonus for each month. And I would agree with that, Your Honor. I think that's exactly what should take place in this case. I do not think that you should take – and in arriving at that period, other than the timeframe, other than the six months that you identify. Okay. But you've got this – it just happened twice, that's all. You've got six months in the first fiscal year. She gets a bonus for that. And she's asking for a rateable part of that bonus to be applied each month. She works six months in the next fiscal year, gets a bonus for that work. And she's asking that a sixth of that bonus be applied to that monthly pay, I assume. Well – Why doesn't – why isn't that what she was actually paid? It was not what she was actually paid, Your Honor, because of the fact that I think it is erroneous to – I think the premise of your question is erroneous. Because I don't think that the bonus was paid just for the six-month period. It was an annual bonus. There was a bonus that was paid in June of 1998. That is at issue. There was another bonus that was paid in June of 1999. Okay. Well, wouldn't it have been twice as high if she'd worked 12 months? I don't believe that that's the case, Your Honor. I don't. We don't – do we know? Is there anything in the record one way or the other on that? I mean, she could get paid up to 20 percent, and I'm told by your opponent that what she got was 20 percent of her six-month salary. Your Honor, I don't have the answer for that question. I don't believe that it is in the record. And I think that what the intent is is that you take a look at it on an annual basis because of the adjustment on August 1st of each year. Well, but you have the – you have her offer of employment in a letter, and they said, well, your bonus this year is going to be competed on our evaluation of your work from now until the end of the year. And that makes me think that they're not giving an annual bonus for the six months she didn't work that year. And I would think maybe the next year they don't give the annual bonus for the second six months that she didn't work. I understand that, Your Honor. To me, that doesn't yield the conclusion that this is something other than an annual bonus, if I'm understanding your statement. Because I think what the intent here is, is this, and I think we will all agree with this, that what we're trying to find out, what is her average monthly earnings? I agree with that. What is that? And how does the bonus figure into that? And I will tell you in straightforward terms that I believe that if the bonus that she received in June of 1999 was part of what she earned during the time that she was working, then it should be counted for that period. And a bonus that she – but likewise, a bonus that she received for working a prior period should apply to the prior period, not to the same period under consideration. And when we take a look at this policy, the language says – I think it's very clear here – it says, basic monthly earnings means the insurer's monthly rate of pre-tax compensation from the employer, regardless of when received, in effect just prior to the date of disability. And the date of disability that we're dealing with, Your Honor, here is October 21 of 1998. So we now have to ask ourselves, what was her basic monthly earning just prior to October 21 of 1998? That would be the salary of $76.50 a month, plus whatever bonus we allocate to that month or the months immediately preceding, if you want to do an average. And I think that's precisely what should take place here. But then she's paid a bonus later, after disability, which reflects her work from March 31 to October when she quit work, isn't it? I think you have that factually incorrect, Your Honor, but would you please restate it so I can be certain? Well, the annual bonus is calculated on a person's fiscal year work, I think. I believe that to be true in this case. So the first year, she gets a bonus the following summer for her work from when she started, which was October, I think, October 6. She gets a bonus for her work October 6 to March 31. Yes. Because she worked half of that fiscal year. Yes, Your Honor. The second bonus she gets is for her work from April 1, 1999, until she is knocked off for disability in October something, 1999. I believe it was October 21 of 1998, Your Honor. I'm sorry. I'm a year off. Well, 1998. So that's a little over six months. And then she gets a bonus for that fiscal year. Now, her last month's pay, I would think, would be whatever she got for that month plus a sixth or a little less of her annual bonus, wouldn't it? It would be, Your Honor, and you would do it, you would calculate it to be consistent with what you're supposing here, and I'm very happy to do that. What it would mean is that you would take a look at the bonus that she got for, if you want to just hypothetically say, October of 1998. What was her basic monthly earning in October of 1998? It was $76.50, okay, plus whatever bonus we want to allocate to the month of October 1998. Okay. But what you don't do is you don't take a bonus from a prior year and say, or a prior time frame and say, and we're going to add that to October as well. I think it's permissible. I think it's proper. If you wish to say, if you want to enlarge the language of regardless when received, say, well, it turns out that in June of 1999, she received a bonus, but it was really a bonus payment for the month of October of 1998. If you want to say that, that's fine, but you should count it just once. Well, I guess when you get into the double counting is only when you take both periods into account. That's correct, Your Honor, and that shouldn't happen. That's what I'm saying. There shouldn't be double counting. Okay, but you see, the way I was proposing it, you would take, to understand what her last month's pay was, you would take that $76.50 or something, you said a month, plus a sixth of her bonus that was paid after she became disabled. If you're saying, if you want to do a different calculation and say, we're going to look at her whole period of employment, and we'll look at all the salaries she was paid monthly, add it all up and divide it by 12 or 12 and a half, then you throw both bonuses in. I'm sorry? Divide it by six. And, Your Honor, and if you were going to do that, I guess what you do, though, in the process of doing that, Your Honor, you ignore the August 1 annual adjustment, and you're pretending as though it does not exist. Because, and let me try to walk through this for just a moment, if I may, the $76.50 figure is there, and nobody disputes that, and that's going to be a component of whatever the total number is for the basic monthly earnings. As of August 1, 1998, we have to ask ourselves, what was the basic monthly earnings? The component is the salary of $76.50, and whatever bonus there is that might appear. If there was no bonus, obviously we wouldn't be talking here. We have a bonus as of August 1, 1998. The most recent one that was paid was June of 1998, and it's on an annual basis. When the first determination was made, it so happened that it was 12 months for the timeframe of when she was hired in 1997 through 1998. But the adjustment is made on August 1 of 1998, and on an annualized basis, because the adjustment is made once a year, and that's the specific language, once a year. And then it's fixed at that point in time. It doesn't say, and we will, and it's whatever rate is in effect at the time of disability. Again, to quote the language, basic monthly earnings means the insurer's monthly rate of pre-tax compensation with the employer  And so you go to August, the previous August 1, as is set forth in the policy, and you say, okay, how do we deal with this bonus? We're supposed to do it on an annual basis, and that's why we divide it by 12 and add it to the basic monthly earning. And that rate is then fixed. And the concept of it being fixed, Your Honor, is very important, and it's being ignored.  Before you get into that, though, I mean, the critical language that your opponent calls our attention to is, regardless of when it is received. Now, how do you deal with that in the context of the adjustment? Now, the district courts seem to say, we're looking at this as earnings. We're not looking at it as receipts. My direct response to that, Your Honor, is this. The reason for having the regardless of when received language in there, specifically tied to basic monthly earnings, is because of the fact that there are salesmen that have these policies, and they may earn the money in a particular month, but they may not actually receive it until much later. And so this is a benefit to the employee. Right. And in this case, the argument is that it was earned during the pre-August period and paid later, and therefore the adjustment has to be reflected. Now, I understand your point about being fixed, but it doesn't really say fixed. There is an adjustment date, and then it says regardless of when it's received. Let me tell you why it should be fixed. Just to go back to your analysis. If your analysis is correct, then the salesman is out of money because it's fixed as of a certain date. It's accrued before that date and received later. Well, I think, Your Honor, there is specifically a difference between earnings and a bonus, and the bonus is calculated or fixed as of August 1, whereas the earnings can be actually received later. If it's fixed as of August 1, why isn't it adjusted when the next August 1 rolls around? Well, Your Honor, it could be, except for the language. It says it will be adjusted for bonuses on August 1 of each year. That's correct, Your Honor. And let me point out something here, which is an anomaly, that the reason why it is fixed and set just once. Just like public civil service employees that get a percentage for their retirement, in many cases of what their last year's earnings was, it's fixed as of the date when they retire. The analogy here is it's fixed as of the date of disability. What do we do with the bonus of $1,200 that was earned and paid on June 15 of 2000? In this case, that's the record. Do we now go back and recalculate and say, no, we're not going to use the $7,000 figure that you received as a bonus? Now you've only got $1,200 this year. Well, the $1,200 was a bonus, I assume, for her work that she's done years afterwards. Is that right? Yes, and that's my point. That's not accrued during the period. See, the problem with your argument is, I think, that really nothing happens on August 1. People, I mean, as I understand the record, you could correct me. No one sits down and says, okay, let's sit down. We're going to calculate it now and put it in the employee's file. Actually, the calculation is done later as of August 1, right? That's correct, Your Honor. So when you say it's fixed on August 1 and you have to, I mean, it seems to me the idea is the August 1 is a peg date for certain things, and then you have to look at what, I mean, the district court seemed to say, all right, let's take a look at what was earned in this accrual period and try to make some sense out of the document. And I do believe that's exactly what the trial court did. And I don't think that's an unreasonable thing to do. That wasn't what I urged in the court below. No, no. But that's why we didn't cross-appeal from that, Your Honor. And I heard when I said that it's fixed as of August 1, it should be fixed as of the date of disability. And then you go to the formula, and the formula is what was the bonus in effect as of August 1, and we add that in. Regardless of when received, though. See, that's the difficulty. I mean, I can, well, I mean, it's an odd contract. But it's a head-scratcher. When you sit down, you really have to work through it. And there are, you know, I think there are probably a number of ways you could go in interpreting it. Now, if you're talking about intent, we don't have the underwriting documents. Where does that leave us on the argument that it has to be construed against your drafting, because you're the drafter? If we're left with a number of plausible interpretations. Well, Your Honor, I think we can accept without the underwriting documents that the intent is never. Well, that's the best. I'm sorry. What we're talking about intent is how is this supposed to mechanically operate. And you're trying to paper it over by saying it's a windfall, nobody wants a windfall. We have to look at what the document says and how it works in this instance to try to make the most sense of it. I agree with that. You aren't, you know, by saying she's not allowed a windfall, everybody pack up our suitcases and go home, it doesn't get me anywhere. So I guess my question is, because we don't have the underwriting documents in front of us, we have different interpretations. What does that do to the argument that it has to be construed against your interpretation because you're the drafter? Well, Your Honor, if you think that what the trial court did was unreasonable and was not a just and proper conclusion, then I think that you have the power to do something differently. Under this circumstance, I don't think what the trial court did was unreasonable. And I don't think that automatically, I think that he had the entire record before him and looked at everything and thought that under the circumstances, the best way to handle this type of circumstances is to do exactly what he did, a partial accrual. He's really not free to do equity. He's supposed to be interpreting contracts as written. That's your problem. Well, Your Honor. I mean, we basically have three interpretations. The district court's yours and your opponent's, and maybe a fourth. And I will have to think about that, at least personally, for a while. But if we're down to three or four plausible interpretations, not unreasonable interpretations of the document, then my question comes back as to your position. How does the – how ought we apply the rules of construction? Well, I think under those circumstances, Your Honor, that what – that there's not an automatic. I do not believe that it's an automatic. It always has to be, not in an ERISA context, that it automatically has to be construed in particular in favor of one party or another. I think that in the interpretation of an ERISA plan, the governing concept always should be is to do what was the most reasonable thing under the circumstances. And the fact that there may be other reasonable explanations is no reason to depart from it. Do you have some authority for that proposition? I haven't cited it in the brief, Your Honor, but I believe there is, yes. From where? Well, the ERISA cases that I've read here in the Ninth Circuit, Your Honor, and elsewhere. And I will endeavor to provide that report. It seems to me ERISA is a rather constrictive system. I agree with that as well, Your Honor. But to bring this back to the point that we're at here, Your Honor, the fact that there are differing reasonable explanations for a particular result doesn't mean the result that was reached should be rejected by this Court. And I don't think that it's an automatic last step because I don't know that you get into a weighing process of what this is reasonable or this is more reasonable. And I think that under the circumstances what the trial court did was the appropriate result. There is room for play in the application of canons of construction. It isn't an automatic process. That's part of a canon, too. Let me ask you this. And my previous colloquy shouldn't be interpreted by you as being against your position, just more of a puzzlement about this case. Given all the circumstances and the different interpretations, would the assistance of the circuit mediator be of interest to you? And will not prejudice your position by saying yes or no because it's completely up to you. But I'm wondering really where this case might be susceptible to a settlement discussion. Your Honor, my straightforward response to that is walking out this door in the past, I've settled cases and agreed to mediation, so my answer would be a yes. Okay. Yeah. All right. Thank you very much, Robert. I listened to our argument that I hadn't really heard before, and some of it left me really scratching my head because it assumes that the August 1 date that's referenced in the policy as an adjustment date is a date to fix something. It assumes that it's the pre-disability August 1. If that was what was intended, it was the simplest thing to state it in the policy. It would have been the simplest thing to put in the summary plan description, which the court has at page 170, an illustration. If you earn a bonus here, if you earn a bonus here, we recognize that the company pays it out at the end of the year, but since it's based on your productivity, we're not going to include anything that you earn if it falls after the pre-disability August 1 date. Regardless of whether you become disabled on September 1, October, November, December, January, February, March 1, you don't get that bonus. We cited to the court the Ninth Circuit's observations in the Burke matter. It's at page 48 of our brief. Any burden of uncertainty created by careless or inaccurate drafting of the summary, which in this case is a carbon copy of the policy, with no explanations, with no limitations, with nothing to indicate that in this case the limitation is sufficiently conspicuous to let an insured know the impact of the scope of this coverage problem, which also tracks the SPD drafting requirements, which we quoted on Roman numeral page 10 of the brief. It is the employee who is powerless to draft these documents. It's a reasonable expectation, given the terms and given the bonus program that's in effect during the fiscal year, that that earning will be protected, and it's unreasonable to come in and vacillate back and forth with different arguments in a court without any showing of uniform construction of these contracts in the manner that always benefits the insurance company. Under ERISA, the protection is to provide the employee with more protection than before ERISA was enacted. In terms of interpreting it just in a reasonable way, what did he say? If the trial court did something unreasonable, you can do something different. If the trial court provided a reasonable interpretation and the other parties, both the defendant and the plaintiff's interpretation, in this case the appellant's interpretation, are both considered reasonable from an objective standpoint, then you have an ambiguous contract that is susceptible to more than one meaning. And in that case, because the contract could have been drafted very specifically and very clearly and provided limitations and illustrations, it has to be construed against the drafter. Let me ask you a question on the record in this case. And I take your point on that. But as I recall, and it's been a while since I looked at that, there was no testimony by the employer in this case tendered. Was there evidence? No. So, I mean, the problem you faulted aside for not putting in the underwriting file. But on the other hand, a lot of the dispute about when, what periods the bonuses were intended to apply to could have been resolved with some evidence as to what the employer intended, right? When Ms. Hemingway presented her pre- She went and found her pre-hire letter. She presented it. She explained in her declaration. And she's still employed there. She goes through this bonus program all the time. Her bonus is now not based on a full-time salary. It's calculated based on a part-time work schedule. So, obviously, her production is down from what it was. She's very well aware of this program. And Unum did not bother to take any depositions, did not find out anything to dispute that. They presented not a scrap of evidence to show that what she stated is inaccurate. They relied strictly on argument. Now, if at a, in terms of whether the construction would be the most reasonable, certainly that might be different under an abuse of discretion standard. But this policy, Unum did not grant itself discretion in this policy.  It's a strict construction rule. I know it's in your brief, but how do you calculate the last month's basic salary? It was, I think the average, well, it's taking the two bonuses that were earned during that pre-disability bonus period, the pre-disability bonus periods. And I think that they ended up like 17,000, yeah, 1730. And you divide that by 12 or 12 and a half? You divide that by the, quote, period of employment, which was 12 and a half months. If you take it to the point that she became disabled, that's 12 and a half months. If you take it to the end of her sick leave, which was 10 days later, and that was the period that STD benefits began and started the 180-day waiting clock for LTD, then it would be 12.7 months. So you're adding a twelfth of bonuses to the 76.50 monthly salary? Yeah. And the average ended up 13.90. We added that to the base salary of 76.50. That total was 90.48, 90.40, and took 60 percent of that, which is the coverage rate. I understand. All right. Well, it's an interesting case. And I thank both of you for your arguments and presentation. We'll go back to the numbers, and we'll issue a decision at some point. Is the assistance of the circuit mediator of interest to you? Well, actually, we went through extensive discussions through the circuit. I don't want to hear anything about the past. Okay. There was an invitation to revisit that process before argument, and we indicated that we would consider it and didn't think that UNUM would be and were apprised that UNUM was not. What we generally do, and we may or may not do this in this case, is if we think it's worthy of an approach, we send you a letter, and then you can elect to participate or not. And, again, if you do, whatever your choice is has no impact on this. I want to assure you of that, and I always hesitate to mention it. But sometimes it seems to me that there are cases that appear in front of us where you think, well, maybe there's more room here to achieve an accord than might have been first apparent. So that's something to think about, and we may or may not send out a letter. Was it the circuit mediation that was offered? Yes. Probably through the initial contact with counsel, I expect. Well, thank you both for your arguments. Thank you very much.
judges: Canby, Noonan, Thomas